JRS/TJT:PJC
F. #2022R00297

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

ERIC ZHU,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
AN ARREST WARRANT

No. 25-MJ-257

(42 U.S.C. § 1320a-7b(b)(2)(B);
18 U.S.C. § 2)

EASTERN DISTRICT OF NEW YORK, SS:

        SAMY HEGAZY, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

        On or about May 3, 2025, within the Eastern District of New York and elsewhere, the defendant ERIC ZHU, together with others, did knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to Individual-1, a Medicaid recipient whose identity is known to me, to induce Individual-1 to purchase, lease, order and arrange for and recommend purchasing, leasing and ordering one or more goods, facilities, services and items for which payment may have been made in whole and in part under a Federal health care program, to wit: Medicaid.

        (Title 42, United States Code, Section 1320a-7b(b)(2)(B); Title 18, United States Code, Section 2)

1

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with HHS-OIG for approximately three years. As a Special Agent, I investigate health care fraud, including schemes to defraud federal health care benefit programs and schemes involving illegal kickbacks and bribes. During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, arranged consensually monitored telephone calls and video recordings, executed search warrants, and reviewed health care claims data, bank records, telephone records, medical records, invoices, and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of federal health care benefit programs.

2. I have personally participated in the investigation of the offense discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) information obtained from witnesses.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a complaint and for the issuance of an arrest warrant, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts, in sum and substance and in part, which I believe are necessary to establish probable cause in support of a complaint and for the issuance of the arrest warrant.

**PROBABLE CAUSE**

I.  The New York State Medicaid Program

  4. The New York State Medicaid program ("Medicaid") is a federal and state health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements, and certain other individuals who lack adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services, is responsible for overseeing the Medicaid program in participating states, including New York. Individuals who receive benefits under Medicaid are referred to as "recipients."

  5. Medicaid is a "Federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f).

  6. Medicaid is a health and long-term care coverage program jointly financed by states and the federal government. Each state establishes and administers its own Medicaid program and determines the type, amount, duration, and scope of services covered within broad federal guidelines. In New York State, Medicaid is administered by the New York State Department of Health ("New York DOH").

  7. New York DOH approves certain Managed Long Term Care ("MLTC") plans to provide Medicaid managed long term care. MLTC plans provide services and support to people who have long-lasting health issues or disabilities. Each MLTC plan has its own network of healthcare providers, including home care agencies, healthcare professionals, and other providers. Managed care Medicaid providers who are within an MLTC network do not bill Medicaid directly, but instead bill the MLTC plan for services they provide to its plan members.

8. Medicaid MLTC services include social adult day care services. The term "social adult day care" ("SADC") describes a structured program that provides older adults with functional impairments socialization, supervision, personal care, and nutrition services in a protective setting. An SADC center would, for example, provide a space where its members can congregate and socialize by talking, playing card or board games, listen to music, sing karaoke, or participate in other activities under the supervision of SADC center staff who are trained to provide assistance to people with mobility and other health issues. Healthy meals, as well as transportation to and from the day care, might also be provided.

9. MLTCs require SADCs to document member attendance, which is often done through sign-in sheets.

10. Medicaid MLTC services also include home health services. MLTCs typically approve qualified Medicaid recipients for a combination of home health and SADC services.

II. The Defendant and Relevant Entities and Individuals

11. The defendant ERIC ZHU is an owner or operator of Prime Life Adult Day Care LLC ("Prime Life").

12. Prime Life is an SADC located in Brooklyn, New York.

13. Individual-1 is a New York Medicaid recipient whose identity is known to me.

14. Individual-2 is a confidential source whose identity is known to me.[1]

---

[1] Individual-2 has pleaded guilty to conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, pursuant to a cooperation agreement, and is cooperating with the government in the hopes for leniency at sentencing. Information Individual-2 has provided to the government has proven reliable and been corroborated by other evidence.

15. Individual-3, a confidential source whose identity is known to me, is ZHU's employee at Prime Life.[2]

16. Individual-4, an individual whose identity is known to me, is a marketer and recruiter for ZHU.

III. The Health Care Fraud and Kickback Scheme

17. On or about May 3, 2025, the defendant ERIC ZHU, together with others, offered and paid kickbacks and bribes to Medicaid recipients, including Individual-1, to induce Individual-1 to arrange for services with ZHU and for SADC services that were not provided and otherwise did not qualify for reimbursement.

18. In or around July 2024, HHS-OIG began investigating Prime Life and related entities for health care fraud, including the payment of illegal kickbacks and bribes and billing for services that were not provided.

A. Recordings and Photographs

19. On or about May 3, 2025, Individual-2 wore an audio and video recording device provided by law enforcement and at the direction of law enforcement while driving to Prime Life and at Prime Life. First, Individual-2 accompanied Individual-1 and Individual-1's spouse by car to Prime Life. While in the car, the driver asked Individual-1 how he/she liked Prime Life, to which Individual-1 responded in sum and substance, "Who cares about the place, we just go there to get the money." Individual-1 explained that he/she and his/her spouse went to Prime Life once per month to receive payment and sign a months' worth of paperwork "in one shot."[3]

---

[2] Individual-3 is cooperating with the government in the hopes for a favorable outcome to any investigation into Individual-3's conduct. Information Individual-3 has provided to the government has proven reliable and been corroborated by other evidence.

[3] These conversations occurred in Urdu and have been translated to English by an individual fluent in both languages.

20.     When Individual-2 arrived at Prime Life, Individual-2 and Individual-1 and his/her spouse were directed downstairs by Individual-3. Individual-3 confirmed to Individual-2 that "Eric" owned Prime Life. Based on my participation in the investigation, I understand that "Eric" is a reference to ZHU.

21.     Once in the basement, Individual-2 observed ZHU count aloud to 15 and hand approximately $1,500 in cash to Individual-1 and his/her spouse.

22.     Individual-2 asked ZHU how much he would pay if Individual-2 brought his/her parents to Prime Life. ZHU explained that he would pay approximately $250 for two days per week of SADC services. When Individual-2 questioned why ZHU would not pay Individual-2 the same rate of $500 that Individual-2 witnessed ZHU pay Individual-1, ZHU described Individual-1 as a "special" case and someone who had referred other Medicaid recipients to ZHU.[4]

23.     ZHU then asked Individual-2 about his/her parents' home care company and offered to pay approximately $300 per month total to Individual-2 if Individual-2's parents switched to ZHU's homecare agency.

24.     On approximately August 2, 2025, Individual-2 returned to Prime Life wearing an audio recording device provided by law enforcement and at the direction of law enforcement. Individual-2 again met ZHU in the basement. Individual-2 brought with him/her two prospective members. Individual-2 told ZHU that one of the individuals was approved for three days of SADC services per week and asked, "What are you going to give me?" ZHU replied, "same as him," indicating to another member who said, "Same, same, five," referring to $500. Individual-2 asked about the rate for two days, and ZHU replied, "For two days I give three," meaning $300. Individual-2 asked if the members needed to attend their approved days

---

[4]     All conversations between ZHU and Individual-2 occurred in English.

or if they could just show up once per month. ZHU replied, "They should come. We encourage people to come, encourage. But you are a smart ▇▇▇▇."

25. Individual-3 has provided the government with additional evidence related to illegal health care kickbacks paid at Prime Life. On approximately August 4, 2025, Individual-3 recorded a telephone conversation at the direction of law enforcement with Individual-4, one of ZHU's marketers who refers members to Prime Life. During that call, Individual-4 asked Individual-3 to handle distributing kickbacks to Individual-4's members. Individual-4 told Individual-3, in sum and substance, "Whoever has their July envelopes left, call them and give it to them. You got to give to them by end of August." Individual-4 further instructed Individual-3 to have the members sign their paperwork: "Call them accordingly and get them to sign and if someone says anything tell them to call [me] and that you don't know anything."[5] Individual-3 has reported that Prime Life's members do not generally attend Prime Life on their approved days and instead show up at the end of the month to be paid.

26. Individual-3 has provided photographs and videos of things he/she has observed at Prime Life. This includes rosters of Prime Life members, videos of members signing attendance records for entire months, and stacks of envelopes containing kickback money. Notably, on approximately August 2, 2025, the same day that Individual-2 visited Prime Life and recorded ZHU, ZHU sent Individual-3 a text message that read, "Make sure when they [the members] come down [to the basement], their phone is in their pants pocket."

---

[5] These conversations occurred in Urdu and have been translated to English by an individual fluent in both languages.

B.   The Medicaid Claims Data and Enrollment Documents

27.   On approximately April 1, 2020, Prime Life entered a contract with MLTC-1, an entity the identity of which is known to me, for the provision of SADC services. That contract was electronically signed by ZHU on behalf of Prime Life. In approximately September 2023, Prime Life renewed its contract with MLTC-1 and ZHU was listed as Prime Life's "Program Director" and the point of contact for insurance claims. ZHU's resume was included with the renewal, which listed him as Prime Life's Program Director since approximately March 2022.

28.   Medicaid claims data shows that, between approximately September 2021 and March 2025, Prime Life billed and was paid approximately $2.8 million for SADC services it purported to provide. Between approximately July 2021 and March 2025, Prime Life billed and was paid approximately $3.1 million for home health services it purported to provide.

29.   MLTC-1's records reflect a business bank account ending in 2262 at Financial Institution-1 (the "2262 Account"), an entity the identity of which is known to me, as the account for receiving reimbursement.

C.   The Bank Records

30.   Records from Financial Institution-1 show that the 2262 Account is held in the name of Prime Life. Checks drawn on the 2262 Account appear to be signed by an individual who, based on my participation in the investigation, I understand to be ZHU's father, and financial records from Financial Institution-1 show that same individual is the sole signatory on the 2262 Account.

\* \* \*

31.   Based on the foregoing, there is probable cause to that the defendant ERIC ZHU has committed the offense of offering and paying illegal health care kickbacks, in violation

of Title 42, United States Code, Section 1320a-7b(b)(2)(B), based on, among other things, his payment and offer of payment of illegal kickbacks and bribes in the form of cash to Individual-1 in exchange for submitting and causing the submission of claims to a federal health care program for Individual-1's purported SADC services.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant ERIC ZHU so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

/s/Samy Hegay
SAMY HEGAZY
Special Agent, HHS-OIG

Sworn to me telephonically this
 26th  day of August, 2025    @6:50 p.m.

*Marcia M. Henry*
THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK